IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs October 1, 2019

## IN RE DEISHUN M. ET AL.

**Appeal from the Juvenile Court for Hamilton County**
**No. 284-875, 284-877     Robert D. Philyaw, Judge**

_____

## No. E2019-00777-COA-R3-PT
_____

Jessica T. ("Mother") appeals the April 3, 2019 order of the Hamilton County Juvenile Court ("Juvenile Court") terminating her parental rights to the minor children, Deishun M. and Olivia M. ("the Children"). Upon petition of the Tennessee Department of Children's Services ("DCS"), the Juvenile Court terminated Mother's rights on the statutory grounds of severe child abuse and persistent conditions. The Juvenile Court further found that termination of Mother's parental rights was in the best interest of the Children. Discerning no error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court**
**Affirmed; Case Remanded**

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P.J., M.S., and KENNY W. ARMSTRONG, J., joined.

Cara C. Welsh, Chattanooga, Tennessee, for the appellant, Jessica T.

Herbert H. Slatery, III, Attorney General and Reporter, and Matt D. Cloutier, Assistant Attorney General, for the appellee, the Tennessee Department of Children's Services.

### OPINION

### Background

DCS became involved with this family in July 2017, following the death of the Children's sibling, K.M. The Children were removed from the custody of Mother and the Children's father, Travis M. ("Father"), on July 9, 2017. DCS alleged that the Children were dependent and neglected and severely abused by the parents.

DCS developed a permanency plan on July 28, 2017. The permanency plan provided for Mother to (1) be able to demonstrate knowledge of Deishun's educational issues and special needs at school, (2) remain informed regarding Deishun's progress, (3) attend educational meetings regarding Deishun, (4) resolve pending legal issues and not incur new criminal charges, (5) provide to DCS a copy of a rental or lease agreement, (6) provide to DCS her driver's license, proof of car insurance, and vehicle registration or otherwise present a transportation plan, (7) pay child support, (8) provide proof of a legal income or disability to DCS, (9) maintain residential stability "in a clean, safe and appropriate home" for a period of six months, (10) comply with a psychological evaluation and follow all recommendations therefrom, (11) take all medication as prescribed and comply with pill counts, (12) participate in individual or family therapy if requested by the treatment provider, (13) maintain visitation with the Children in a positive manner, (14) attend meetings at DCS and court hearings, (15) cooperate with all service providers and follow their recommendations, (16) complete parenting classes, (17) maintain contact with DCS and notify DCS of any changes to her contact information within twenty-four hours, (18) complete a parenting assessment and follow the resultant recommendations, (19) refrain from engaging in violence with other individuals, (20) complete domestic violence classes, (21) participate in all medical appointments for Olivia, (22) be informed of Olivia's medical or dental appointments, (23) demonstrate knowledge of Deishun's medical needs and necessary care, and (24) participate in all medical appointments for Deishun. The permanency plan was ratified by the Juvenile Court in October 2017 upon the Juvenile Court's finding that the plan was in the best interest of the Children.

The Juvenile Court conducted an adjudicatory hearing and severe abuse trial on four nonconsecutive days occurring in February, March, and April 2018. Following trial, the Juvenile Court entered its order finding by clear and convincing evidence that the Children were dependent and neglected and severely abused by both parents. As to Father, the Juvenile Court found, pursuant to Tennessee Code Annotated § 37-1-102(b)(22)(A), that Father had severely abused the Children due to his action of leaving his three children, K.M. and the Children, in a hot car all day which could have resulted in severe bodily injury to the Children and did result in the death of K.M. The Juvenile Court found that sufficient evidence was not presented to establish that Mother knew the Children and K.M. had been left in a hot car all day and, therefore, did not find that Mother had committed severe abuse pursuant to Tennessee Code Annotated § 37-1-102(b)(22)(A).

However, the Juvenile Court further found that both Mother and Father had severely abused the Children, pursuant to Tennessee Code Annotated § 37-1-102(b)(22)(B), "based on the expert testimony of Dr. [Heather] Gilliam, the home environment the children were living in, the parents' medical neglect of the subject children, the condition of the children's health, and the resulting developmental delays

that have been observed in the child, Deishun." In its adjudicatory hearing and severe abuse order, the Juvenile Court found as follows regarding the Children's circumstances that led to the Court's finding of severe child abuse against Mother:

> The Court received numerous photos of the deceased infant, the subject children, the vehicle, the scene of the death, and the home where the family had been living. Several witnesses, including CPD Officers Rankhorn, Booker and Grafe, testified that the family home was the worst residence they had ever seen, and the Court agreed that this may have been the worst the Court had seen. The Court found that the home was not clean, and witnesses who had entered the home testified that there was an overpowering smell of urine and/or feces present. The Court also noted photographs and testimony regarding numerous roaches present in the home, piles of feces (with no evidence or testimony that any pets lived within the home), clutter, lack of food (some was present but most was spoiled), the floors were filthy, there was a filthy torn up couch with feces smeared on it. Overall, the Court found that the apartment where the family lived was in deplorable condition.

> Testimony was also presented that the parents did not take the children to the doctor, despite their young age and despite Deishun's apparent delays. The subject child, Deishun, had not seen a doctor in three (3) years. The subject child, Olivia, had not seen a doctor since her birth or shortly thereafter. Testimony was heard that the mother had claimed she did not get the children vaccinated due to her belief that vaccines could cause a mental disorder, but the proof was clear that the children had not been vaccinated because the children had not been taken to the doctor or any medical provider in years.

> The Court heard a substantial amount of testimony and received medical records regarding the subject child, Deishun. Specifically, the Court heard proof regarding Deishun's developmental delays, bruises observed on his body, black eyes observed on him, his lethargy and inability to walk well after having been in the father's vehicle on July 8, 2017. In addition, the Court heard proof regarding Deishun's low weight. CPS investigators Catherine Gray and Marilyn Baldwin testified about his thinness and his ribs being visible when he entered DCS custody. The Court also heard testimony that Deishun could only speak a few words upon entering DCS custody.

> The Court noted it is unknown how many of Deishun's developmental delays were due to the lead that was found to be in his and Olivia's system, and for what sustained period of time the children were

exposed to lead since neither child had seen a doctor who likely would have tested for any lead exposure.

Several witnesses testified that the subject children were observed to be very protective of their food. Olivia appeared to be in much better health than her older brother, Deishun. Deishun was not potty trained at five (5) years old when he was removed from his parents, but he was potty trained by the foster parents within a month of being in DCS custody. The Court found this . . . fact to be significant.

Testimony was heard that the family had lived in the Westside Chattanooga Housing Authority apartments for the past two (2) years.

On March 12, 2018, the Court heard testimony that the children were cleaned up by emergency and police personnel on the scene before being transported to Erlanger Medical Center. Earlier testimony had noted the smell of the clothes the children were wearing was so bad that it permeated the bag into which the clothes were placed. The Court found it deplorable that even after the children had been cleaned up, their odor and their clothes still smelled offensively bad.

The Court found the testimony from [A.T. ("Ms. A.T.")], the first foster parent, significant to parenting issues. Specifically, Ms. [A.T.] had testified that the children did not have any type of schedule, and that they did not know when to sleep or when to get up. Ms. [A.T.] testified about the children hoarding food. Ms. [A.T.] also testified that the subject child, Olivia, was so concerned with the whereabouts of the foster parent, she attempted to sleep standing up within view of the foster parent.

The Court heard testimony from the current foster parents, [D.M. ("Ms. M.") and M.T. ("Ms. T.")]. They testified that they have been taking the subject children to the doctor regularly and their lead levels are declining. In addition, Deishun is now potty trained and attends school where he has an individualized education plan (IEP) in place.

Ms. [M.] had testified about how she attempted to get the mother away from the father years ago, and that she took the mother and the subject child, Deishun, with her to Atlanta when Deishun was still a baby. Ms. [M.] testified that the mother only stayed with her about three (3) weeks and left with Deishun in the middle of the night. Significantly, the mother did not take any of Deishun's baby supplies with her when she left, which the Court found to be a foreshadowing of her lack of care for her children.

Ms. [M.'s] partner, Ms. [T.], testified about the children's progress since being placed in their home. Ms. [T.] stated that the subject children now know about forty (40) to fifty (50) words. Deishun attends Wallace A. Smith Elementary, where he is in kindergarten. His lead levels have gone down some, but they are not yet where they need to be.

\* \* \*

In addition, pursuant to TCA 37-1-102 (b)(22)(B), the Court found the subject children are the victims of severe abuse by both the mother and the father. The Court reviewed a deposition of Dr. Heather Gilliam, M.D., an expert in the field of pediatrics, who has treated the subject children in the Vance Stafford Pediatric Clinic at Erlanger Hospital. The Court found clear and convincing evidence that the parents committed severe child [abuse] pursuant to TCA 37-1-102(b)(22)(B) based on the expert testimony of Dr. Gilliam, the home environment the children were living in, the parents' medical neglect of the subject children, the condition of the children's health, and the resulting developmental delays that have been observed in the child, Deishun.

(Underlining omitted.) The Juvenile Court also ordered that the Children would remain in foster care. In May 2018, the Juvenile Court relieved DCS of making any further reasonable efforts with the parents due to the finding of severe child abuse. Father appealed the Juvenile Court's order, but all parties entered an agreed order on July 9, 2018, dismissing the appeal to the circuit court.

In October 2018, DCS filed a petition to terminate Mother's parental rights. The Juvenile Court conducted a trial in February 2019. The Juvenile Court entered an order in April 2019 finding that DCS had proven by clear and convincing evidence the statutory grounds of severe child abuse and persistent conditions. The Juvenile Court further found by clear and convincing evidence that termination of Mother's parental rights was in the Children's best interest. Mother timely appealed to this Court.

## Discussion

Although not stated exactly as such, Mother raises the following issues on appeal: (1) whether the Juvenile Court violated Mother's due process rights by proceeding with the termination action when Mother's criminal charges directly related to the grounds for termination were pending, (2) whether the Juvenile Court erred by finding by clear and convincing evidence that the conditions leading to the Children's removal from Mother's custody persisted, and (3) whether the Juvenile Court erred by determining by clear and

convincing evidence that termination of Mother's parental rights was in the Children's best interest.

With regard to the termination of parental rights, our Supreme Court has instructed:

A parent's right to the care and custody of her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions.[1] *Troxel v. Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054, 147 L. Ed.2d 49 (2000); *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S. Ct. 1208, 31 L. Ed.2d 551 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *In re Adoption of Female Child*, 896 S.W.2d 546, 547-48 (Tenn. 1995); *Hawk v. Hawk*, 855 S.W.2d 573, 578-79 (Tenn. 1993). But parental rights, although fundamental and constitutionally protected, are not absolute. *In re Angela E.*, 303 S.W.3d at 250. "'[T]he [S]tate as *parens patriae* has a special duty to protect minors . . . .' Tennessee law, thus, upholds the [S]tate's authority as *parens patriae* when interference with parenting is necessary to prevent serious harm to a child." *Hawk*, 855 S.W.2d at 580 (quoting *In re Hamilton*, 657 S.W.2d 425, 429 (Tenn. Ct. App. 1983)); *see also Santosky v. Kramer*, 455 U.S. 745, 747, 102 S. Ct. 1388, 71 L. Ed.2d 599 (1982); *In re Angela E.*, 303 S.W.3d at 250. "When the State initiates a parental rights termination proceeding, it seeks not merely to infringe that fundamental liberty interest, but to end it." *Santosky*, 455 U.S. at 759, 102 S. Ct. 1388. ["]Few consequences of judicial action are so grave as the severance of natural family ties." *Id.* at 787, 102 S. Ct. 1388; *see also M.L.B. v. S.L.J.*, 519 U.S. 102, 119, 117 S. Ct. 555, 136 L. Ed.2d 473 (1996). The parental rights at stake are ["]far more precious than any property right." *Santosky*, 455 U.S. at 758-59 102 S. Ct. 1388. Termination of parental rights has the legal effect of reducing the parent to the role of a complete stranger and of ["]severing forever all legal rights and obligations of the parent or guardian of the child." Tenn. Code Ann. § 36-1-113(l)(1); *see also Santosky*, 455 U.S. at 759, 102 S. Ct. 1388 (recognizing that a decision terminating parental rights is ["]*final* and irrevocable"). In light of the interests and consequences at stake, parents are constitutionally entitled to ["]fundamentally fair procedures" in termination proceedings. *Santosky*, 455 U.S. at 754, 102 S. Ct. 1388; *see also Lassiter v. Dep't of Soc. Servs. of Durham Cnty., N.C.*, 452 U.S. 18, 27, 101 S. Ct. 2153, 68 L. Ed.2d 640

---

[1] U.S. Const. amend. XIV § 1 ("[N]or shall any State deprive any person of life, liberty, or property, without due process of law . . . ."). Similarly, article 1, section 8 of the Tennessee Constitution states "[t]hat no man shall be taken or imprisoned, or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or in any manner destroyed or deprived of his life, liberty or property, but by the judgment of his peers or the law of the land."

(1981) (discussing the due process right of parents to fundamentally fair procedures).

Among the constitutionally mandated ["]fundamentally fair procedures" is a heightened standard of proof – clear and convincing evidence. *Santosky*, 455 U.S. at 769, 102 S. Ct. 1388. This standard minimizes the risk of unnecessary or erroneous governmental interference with fundamental parental rights. *Id.*; *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). ["]Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d at 596 (citations omitted). The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005).

Tennessee statutes governing parental termination proceedings incorporate this constitutionally mandated standard of proof. Tennessee Code Annotated section 36-1113[sic](c) provides:

> Termination of parental or guardianship rights must be based upon:
>
> (1) A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and
> (2)  That termination of the parent's or guardian's rights is in the best interests of the child.

This statute requires the State to establish by clear and convincing proof that at least one of the enumerated statutory grounds[2] for termination exists and that termination is in the child's best interests. *In re Angela E.*, 303 S.W.3d at 250; *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). "The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." *In re Angela E.*, 303 S.W.3d at 254. Although several factors relevant to the best interests analysis are statutorily enumerated,[3] the list is illustrative, not exclusive. The parties are free to offer proof of other relevant factors. *In re Audrey S.*,

---

[2] Tenn. Code Ann. § 36-1-113(g)(1)-(13).
[3] Tenn. Code Ann. § 36-1-113(i).

182 S.W.3d at 878. The trial court must then determine whether the combined weight of the facts "amount[s] to clear and convincing evidence that termination is in the child's best interest." *In re Kaliyah S.*, 455 S.W.3d 533, 555 (Tenn. 2015). These requirements ensure that each parent receives the constitutionally required "individualized determination that a parent is either unfit or will cause substantial harm to his or her child before the fundamental right to the care and custody of the child can be taken away." *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999).

Furthermore, other statutes impose certain requirements upon trial courts hearing termination petitions. A trial court must "ensure that the hearing on the petition takes place within six (6) months of the date that the petition is filed, unless the court determines an extension is in the best interests of the child." Tenn. Code Ann. § 36-1113[sic](k). A trial court must "enter an order that makes specific findings of fact and conclusions of law within thirty (30) days of the conclusion of the hearing." *Id*. This portion of the statute requires a trial court to make "findings of fact and conclusions of law as to whether clear and convincing evidence establishes the existence of each of the grounds asserted for terminating [parental] rights." *In re Angela E.*, 303 S.W.3d at 255. "Should the trial court conclude that clear and convincing evidence of ground(s) for termination does exist, then the trial court must also make a written finding whether clear and convincing evidence establishes that termination of [parental] rights is in the [child's] best interests." *Id*. If the trial court's best interests analysis "is based on additional factual findings besides the ones made in conjunction with the grounds for termination, the trial court must also include these findings in the written order." *Id*. Appellate courts "may not conduct de novo review of the termination decision in the absence of such findings." *Id*. (citing *Adoption Place, Inc. v. Doe*, 273 S.W.3d 142, 151 & n.15 (Tenn. Ct. App. 2007)).

### B. Standards of Appellate Review

An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). *In re Bernard T.*, 319 S.W.3d at 596; *In re Angela E.*, 303 S.W.3d at 246. Under Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. *In re Bernard T.*, 319 S.W.3d at 596; *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007). In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by

the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. *In re Bernard T.*, 319 S.W.3d at 596-97. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. *In re M.L.P.*, 281 S.W.3d at 393 (quoting *In re Adoption of A.M.H.*, 215 S.W.3d at 810). Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness. *In re Angela E.*, 303 S.W.3d at 246.

*In re Carrington H.*, 483 S.W.3d 507, 521-24 (Tenn. 2016) (footnotes in original but renumbered).

We first will address Mother's issue of whether the Juvenile Court violated Mother's due process rights by proceeding with the termination of parental rights trial when Mother's criminal charges were pending. According to Mother, the issue of whether Mother severely abused the Children "has never been properly litigated" due to Mother's pending criminal charges and the finding of severe child abuse should not be considered final until her criminal charges have been resolved.

Although this Court has determined that pending criminal charges can be a basis for continuation of civil proceedings, Mother is not "absolutely entitled" to a stay or continuance of the termination proceedings "simply because criminal charges are pending against [her]." *See Bell v. Todd*, 206 S.W.3d 86, 93-94 (Tenn. Ct. App. 2005). Trial courts shall, consistent with due process, expedite all contested termination of parental rights cases so as to prevent a child from languishing in foster care unnecessarily. *See* Tenn. Code Ann. § 36-1-124. The intent of General Assembly was that permanency for the child should "not be delayed any longer than is absolutely necessary consistent with the rights of all parties" and that the "rights of the child to permanency at the earliest possible date" should be prioritized over all other civil litigation other than child protective services cases. Tenn. Code Ann. § 36-1-124(c). The decision whether to continue the termination proceedings on the basis of Mother's criminal charges is within the discretion of the trial court. *Bell*, 206 S.W.3d at at 94.

The Juvenile Court found that the prior finding of severe child abuse by Mother in the dependency and neglect proceedings was *res judicata* in this case. Following four days of trial, the Juvenile Court found by clear and convincing evidence that Mother had severely abused the Children, pursuant to Tennessee Code Annotated § 37-1-102(b)(22)(B).[4] This Court has previously determined that a prior finding by the juvenile

---

[4] Following the severe abuse hearing in April 2018, the statute was amended and the definition of severe child abuse was relocated from Tennessee Code Annotated § 37-1-102(b)(22) to § 37-1-102(b)(27). For

court in the dependency and neglect proceedings can be *res judicata* in the termination proceedings. *See In re Dakota C.R.*, 404 S.W.3d 484, 497 (Tenn. Ct. App. 2012). In such cases, the doctrine of *res judicata* prevents the issue from being re-litigated in the subsequent termination proceeding. *Id.*

The Juvenile Court entered an order in April 2018, finding that Mother had severely abused the Children "based on the expert testimony of Dr. Gilliam, the home environment the children were living in, the parents' medical neglect of the subject children, the condition of the children's health, and the resulting developmental delays that have been observed in the child, Deishun." Mother did not appeal the finding of severe child abuse against her. Father appealed the order finding severe child abuse but ultimately dismissed his appeal, and Mother's counsel signed the agreed order dismissing the appeal. The April 2018 order finding that Mother committed severe child abuse is a final order. The Juvenile Court conducted a trial over four nonconsecutive days and heard testimony from several witnesses. Both Mother and DCS were involved in the dependency and neglect proceedings and the matter was fully litigated at that time. It also is of note that the Juvenile Court found that insufficient evidence was presented as to Mother's knowledge that the Children and K.M. had been left in the hot car, and, therefore, did not find that Mother had committed severe abuse under Tennessee Code Annotated § 37-1-102(b)(22)(A). As such, we determine that the Juvenile Court properly determined that the finding of severe child abuse against Mother was *res judicata*.

We further note that the pending criminal proceedings are separate and distinct from the severe child abuse and parental termination actions, with differing standards of proof. In severe child abuse cases, the petitioner must prove that the perpetrator committed severe child abuse by clear and convincing evidence, while the state must prove the higher standard of proof, beyond a reasonable doubt, in criminal proceedings.

---

consistency's sake, we will cite to the statute in effect at the time of the severe child abuse finding by the Juvenile Court. At the time of the severe abuse hearing, Tennessee Code Annotated § 36-1-102(b)(22) provided in pertinent part:

"Severe child abuse" means:

(A)(i) The knowing exposure of a child to or the knowing failure to protect a child from abuse or neglect that is likely to cause serious bodily injury or death and the knowing use of force on a child that is likely to cause serious bodily injury or death; [or]

* * *

(B) Specific brutality, abuse or neglect towards a child that in the opinion of qualified experts has caused or will reasonably be expected to produce severe psychosis, severe neurotic disorder, severe depression, severe developmental delay or intellectual disability, or severe impairment of the child's ability to function adequately in the child's environment, and the knowing failure to protect a child from such conduct[.]

Even if Mother were subsequently acquitted in a jury trial during the criminal proceedings, the acquittal would not affect the finality and *res judicata* provided to the Juvenile Court's judgment which found by clear and convincing evidence that Mother committed severe child abuse against the Children. *See In re Dakota C.R.*, 404 S.W.3d at 498 ("[T]he fact that a jury failed to conclude that [the parent] committed criminal aggravated child abuse beyond a reasonable doubt is not fatal to the trial court's finding that [the parent] committed severe child abuse based on clear and convincing evidence."). We find and hold that the Juvenile Court did not err by proceeding with the termination proceedings despite the pendency of the criminal charges against Mother.

We next address whether the Juvenile Court erred by finding the ground of persistent conditions against Mother. As to persistence of conditions, Tennessee Code Annotated § 36-1-113(g)(3) (Supp. 2019) provides:

> (3)(A) The child has been removed from the home or the physical or legal custody of a parent or guardian for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and:
>
> > (i) The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent or guardian, or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent or guardian;
> >
> > (ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or guardian in the near future; and
> >
> > (iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home;
>
> (B) The six (6) months must accrue on or before the first date the termination of parental rights petition is set to be heard;

Regarding this case, the Children were removed from the parents' custody on July 9, 2017, and placed in foster care. The Children were removed from the parents following an incident where Father left the Children and their sibling, K.M., in a hot car during the day while he worked resulting in the death of K.M. Although the Juvenile Court found that DCS had not proven that Mother had knowledge that the Children were

left in the hot car, the Children were removed from her custody due to environmental neglect and medical neglect. The Juvenile Court subsequently found that the Children were dependent and neglected in the care of the parents. The Children had been removed from Mother's custody by order of the Juvenile Court for more than the required six months prior to the initial setting of the termination trial.

Following the termination trial, the Juvenile Court found that even after the Children had entered DCS custody, Mother had not been able to secure suitable housing for the Children. Mother had been incarcerated for forty-five days following the removal of the Children from her care, and she had been evicted from the home she resided in with the Children and Father due to the condition of the home and failure to pay rent. At the time of trial, Mother had been residing in a one-room extended stay hotel room for some months. Prior to residing in the hotel room, she was living at a friend's apartment. According to Mother, she was not on the lease but had paid rent to her friend. Mother, however, testified that she did not know the friend's last name. Mother testified that since her release from jail, she had been living in either motels, extended stay hotels, or her friend's apartment.

Mother had completed parenting classes and domestic violence counseling after the Children entered foster care. She also had maintained employment at Steak and Shake restaurant for a year. Mother further testified that she had a mental health assessment but that she did not think she had provided proof of that to DCS. Mother stated that she had been diagnosed with depression. According to Mother, the provider recommended that she take medication and attend medication management. Mother also testified that the provider offered her therapy. Mother explained that she could participate in therapy if she "wanted it" but that it was not recommended to her, and she did not believe she needed therapy.

Mother testified that her lack of transportation and insufficient income had prevented her from attending some of the appointments and getting things done. Mother further testified that she had taken her medication as prescribed almost every day and had taken it as recently as the day prior to trial. When asked whether she had informed a DCS representative that she had not taken her medication as prescribed, Mother stated, "I plead the Fifth." Mother subsequently answered the question and denied making that statement to a DCS representative.

Mother acknowledged that she had not been to her mental health provider since August 2018. When asked how she was getting her medication, Mother stated, "I'm not." When asked why she was not taking her medication, Mother replied that she was not used to taking medication. According to Mother, she did not believe she needed the medication. Mother explained that the prescription medication she had taken recently in the days prior to trial was from the thirty pills she received from a prescription in August

2018. The Juvenile Court found that Mother had attended appointments with her mental health provider only twice and had taken her medication sporadically.

The DCS representative, Lashunda Williams, testified that Mother had not made significant progress since she had become the case manager in May 2018. Mother acknowledged that she was not yet in a position to take custody of the Children but that she had been working on getting a place to live and obtaining her driver's license. According to Mother, it would take her a month to place herself in a position to assume custody of the Children. The Juvenile Court, however, found that a month was unlikely to make a significant difference in Mother's circumstances.

The Juvenile Court found that Mother currently had a place to live and had maintained employment but that she had both of those things when the Children were removed from her custody, and the Children "still suffered from abuse and neglect." Emphasizing Mother's failure to comply with mental health treatment and take her medication consistently, the Juvenile Court found that the conditions that led to the Children's removal from her custody persisted and that other conditions were present that would result in the Children being further abused or neglected.

The record reflects that Mother had been charged with three counts of attempted aggravated child abuse, which were pending at the time of trial. The Trial Court found that Mother had not followed through with her mental health treatment and had "been unable to secure suitable housing." Due to Mother's lack of suitable housing, failure to comply with her mental health treatment, and pending criminal charges, the Juvenile Court found that there was little chance the existing conditions preventing the Children's return to Mother would be remedied soon. Additionally, the Juvenile Court found that the Children were thriving in their foster home, that the foster parents desired to adopt the Children, and continuation of the parent-child relationship greatly diminished the chances for the Children to be placed into a safe, stable, and permanent home. The evidence presented does not preponderate against the Juvenile Court's findings and those findings show clear and convincing evidence as to this statutory ground. We, therefore, affirm the Juvenile Court as to the ground of persistent conditions.

Having determined that grounds exist for the termination of Mother's parental rights, we next address the best interest analysis. Tennessee Code Annotated § 36-1-113(i) provides a set of non-exclusive factors courts are to consider in determining whether termination of parental rights is in a child's best interest:

> (i) In determining whether termination of parental or guardianship rights is in the best interest of the child pursuant to this part, the court shall consider, but is not limited to, the following

(1)      Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2)      Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3)      Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4)      Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5)      The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6)      Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7)      Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8)      Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9)      Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i) (Supp. 2019).

With regard to making a determination concerning a child's best interest, our Supreme Court has instructed:

When conducting the best interests analysis, courts must consider nine statutory factors listed in Tennessee Code Annotated section 36-1-113(i). These statutory factors are illustrative, not exclusive, and any party to the termination proceeding is free to offer proof of any other factor relevant to the best interests analysis. *In re Carrington H.*, 483 S.W.3d at 523 (citing *In re Audrey S.*, 182 S.W.3d 838, 878 (Tenn. Ct. App. 2005)). Facts considered in the best interests analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence." *In re Kaliyah S.*, 455 S.W.3d at 555 (citing *In re Audrey S.*, 182 S.W.3d at 861). "After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest[s]." *Id*. When considering these statutory factors, courts must remember that "[t]he child's best interests [are] viewed from the child's, rather than the parent's, perspective." *In re Audrey S.*, 182 S.W.3d at 878. Indeed, "[a] focus on the perspective of the child is the common theme" evident in all of the statutory factors. *Id*. "[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child. . . ." Tenn. Code Ann. § 36-1-101(d) (2017).

Ascertaining a child's best interests involves more than a "rote examination" of the statutory factors. *In re Audrey S.*, 182 S.W.3d at 878. And the best interests analysis consists of more than tallying the number of statutory factors weighing in favor of or against termination. *White v. Moody*, 171 S.W.3d 187, 193-94 (Tenn. Ct. App. 2004). Rather, the facts and circumstances of each unique case dictate how weighty and relevant each statutory factor is in the context of the case. *See In re Audrey S.*, 182 S.W.3d at 878. Simply put, the best interests analysis is and must remain a factually intensive undertaking, so as to ensure that every parent receives individualized consideration before fundamental parental rights are terminated. *In re Carrington H.*, 483 S.W.3d at 523. "[D]epending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." *In re Audrey S.*, 182 S.W.3d at 878 (citing *White v. Moody*, 171 S.W.3d at 194). But this does not mean that a court is relieved of the obligation of considering all the factors and all the proof. Even if the circumstances of a particular case ultimately result in the court ascribing more weight—even outcome determinative weight—to a particular

- 15 -

statutory factor, the court must consider all of the statutory factors, as well as any other relevant proof any party offers.

*In re Gabriella D.*, 531 S.W.3d 662, 681-82 (Tenn. 2017).

On appeal, Mother contends that the Juvenile Court erred by finding clear and convincing evidence that termination of her parental rights was in the Children's best interest. The Juvenile Court considered the factors enumerated in Tennessee Code Annotated § 36-1-113(i) before ultimately concluding that those relevant factors weighed in favor of terminating Mother's parental rights to the Children. In its termination order, the Juvenile Court recognized that Mother had maintained employment and paid some child support but pointed to Mother's inability to maintain stable housing and her failure to address her mental health needs in finding that Mother had not made changes to her conduct or circumstances such that it was safe for the Children to return to her custody. The Juvenile Court also found that DCS had assisted Mother with services until being relieved of making reasonable efforts to reunify the Children with Mother in May 2018. At the time of trial, Mother admitted she was not in a position at that time to care for the Children. The Juvenile Court determined that providing Mother with another month was unlikely to make a significant difference in her circumstances. The Juvenile Court found that despite the efforts of DCS, Mother had not made lasting changes in her lifestyle or conduct and that such change did not appear forthcoming in the near future.

The Juvenile Court further found that no meaningful relationship existed at the time of trial between the Children and Mother and that continuing that relationship would be detrimental to the Children's "long-term permanency." Additionally, the Juvenile Court recognized the substantial progress the Children had made with the foster parents and that removing the Children from the foster home "would be detrimental to their stability and would slow their progress." Consequently, the Juvenile Court concluded that changing the Children's caregivers at this point in the Children's lives would have a detrimental effect on them.

Additionally, the Juvenile Court found that Mother had severely abused and neglected the Children. Furthermore, due to Mother's failure to comply with her mental health treatment and not taking her medication consistently, Mother's mental and emotional state would be detrimental to the Children and prevent her from effectively parenting them. Considering all the foregoing, the Juvenile Court concluded that termination of Mother's parental rights was in the Children's best interest.

Upon our review of the record on appeal, we determine that the evidence presented does not preponderate against the Juvenile Court's findings and that those findings are clear and convincing evidence that termination of Mother's parental rights was in the best interest of the Children. We, therefore, affirm the Juvenile Court's judgment terminating Mother's parental rights in its entirety.

- 16 -

## Conclusion

The judgment of the Juvenile Court is affirmed, and this cause is remanded to the Juvenile Court for collection of the costs assessed below. The costs on appeal are assessed against the appellant, Jessica T., and her surety, if any.

_____
D. MICHAEL SWINEY, CHIEF JUDGE